UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00048-TBR

BECKY LEARY                                                                              PLAINTIFF

v.

FORD MOTOR COMPANY                                                                  DEFENDANT

## Memorandum Opinion

This matter is before the Court upon Defendant Ford Motor Company's motion for summary judgment. [DN 14.] Plaintiff Becky Leary responded, [DN 22], and Ford replied, [DN 29]. Fully briefed, this matter is ripe for adjudication. For the following reasons, Ford's motion [DN 14] is GRANTED.

## I. Facts and Procedural History

Becky Leary is an engineer who worked for Ford Motor Company from 2000 to 2015. She started out as a composites expert at Ford's Dearborn, Michigan facilities. [DN 14-4 at 5.] Leary was transferred to Ford's Louisville, Kentucky truck plant in 2006, and remained there until she was terminated in May 2015. [DN 14-5 at 4-5.] Throughout her tenure, it seems that Leary's work product was generally satisfactory.

According to Ford, however, the same cannot be said for Leary's on-the-job behavior. Her disciplinary record reflects a series of infractions beginning in 2012, when Leary worked as an Incoming Quality Manager under supervisor Milton Littles. While driving a company vehicle under the influence of alcohol, Leary was involved in a single-vehicle accident. [DN 14-4 at 13.] Leary pleaded guilty to a

second-offense DUI charge, and her license was suspended for one year. [*Id.*] Although she informed Ford of the accident, Leary admits she did not tell anyone at the company it was alcohol-related or her license was suspended. [*Id.*] She continued to drive her personal vehicle and her management lease vehicle on company property until Ford discovered her DUI conviction in February 2013. For driving a leased vehicle while under the influence of alcohol, failing to notify Ford of her license suspension, and driving a vehicle on company property during that suspension, Ford suspended Leary without pay for four weeks. [DN 14-6 at 1.]

The rest of Leary's several disciplinary infractions fall under two broad categories: attendance and language. A February 28, 2014 "Attendance Counseling Letter" suggests Leary was experiencing a pattern of "attendance-related concerns." [DN 14-8 at 1.] Leary's start time was 6:00 a.m., but on March 11, Leary admits she did not call in and inform Littles she was going to be late until 6:19 a.m. [DN 14-4 at 22.] She also says she had "several moments of tardiness" during March 2014. [*Id.* at 23.] Leary was absent from work on April 24, 2014, after she told supervisors she was experiencing behavioral issues with her teenage daughter. *See* [DN 14-10.] Leary was not disciplined for this absence.

Over the next few months, Leary's pattern of tardiness continued:

- May 21: Leary called in at 7:41 a.m. and arrived around 9:00 a.m. [DN 14-13 at 1.]

- May 30: Leary called in at 6:24 a.m., telling Littles she would arrive at 7:00 a.m. [*Id.*]

- July 10: Leary called in at 8:23 a.m., asking for that day and the next day off to deal with family issues. Ford imposed formal Attendance Guidelines. [DN 14-17 at 1.]

- August 15: Leary arrived at 6:30 a.m. without first calling in, violating her Attendance Guidelines. Ford imposed a two-year letter of reprimand. [DN 14-16 at 1.]

- August 18: Per her request, Leary's start time is moved to 7:00 a.m. [*Id.* at 8.]

- September 12: Leary called in at 6:40 a.m. and arrived at approximately 7:30 a.m., both in violation of her Attendance Guidelines. [DN 14-20 at 1.] Leary claimed she had to stop by the hospital on her way in to work to possibly have her foot x-rayed. [DN 14-19 at 1.]

- October 13: Leary arrived at 7:10 a.m., attributing her tardiness to heavy traffic. [DN 14-21 at 1.]

- October 17: Ford suspends Leary for one week without pay for the September 12 tardy. [DN 14-20 at 1.]

On each occasion, Leary was cautioned that her failure to arrive in a timely fashion and abide by her Attendance Guidelines could result in further disciplinary action, up to and including her dismissal.

Throughout 2014, Leary frequently butted heads with her supervisor, Milton Littles. During her deposition, Leary testified that Littles routinely and unjustifiably complained about issues Leary viewed as minor, such as her tardiness

3

and the dress code. [*Id.* at 19] Leary and Littles also "battled over a 6:30 meeting every morning" that Leary did not feel was necessary. [*Id.*] On or about February 25, 2014, Leary had a conversation with Salaried Personnel Supervisor Chuck Hoffman, during which Leary complained she was being harassed by Littles. *See* [DN 14-9 at 1.] Hoffman asked Leary to provide specific details regarding her allegations of harassment, but she never did. [DN 14-4 at 20.] She did say, however, that Littles, an African-American man, presented "the worst case of reverse discrimination [she'd] ever seen in [her] career," describing Littles as "seeming incompetent and illiterate." [*Id.*]

Leary met with Lisa Flaherty, a Salaried Personnel representative, on April 29, 2014 to discuss Leary's family issues. [DN 14-11 at 4.] Littles dropped in on that meeting, and Leary asked him to stay. [*Id.*] Near the meeting's end, Littles told Leary her Leadership Development Profile (LDEP) was due the following day. [*Id.* at 1.] Leary replied, "Bite me." [*Id.*] When Flaherty told Leary that her comment towards Littles was inappropriate, Leary added, "Oh, that's endearment. Milton, you know I don't give a f*** about the LDEP. I may make you sweat and get it to you at 5:00 PM tomorrow." [*Id.*] Following an investigation, Ford imposed a two-year letter of reprimand for Leary's "disrespectful and abusive language . . . used towards her manager." [*Id.* at 2.] Leary testified she did indeed make these comments, but said they were "factory slang" and a running joke between herself and Littles. [DN 14-4 at 26.] She further clarified, saying "the F word is the most universal automotive word there is." [*Id.*]

A few months later on June 24, Littles was conducting a daily startup meeting. Leary and two other managers were in attendance. [DN 14-14 at 1.] According to Leary, she had prepared a document for Littles to apprise him of a quality control issue, and spent "20 to 30 minutes of the meeting . . . reading the document to Mr. Littles, making sure that he understood it so that he could report it to the plant manager." [DN 14-4 at 28.] After she finished reading from her report, Littles asked a question that made it seem to Leary that Littles had not understood what she just finished saying. [*Id.*] According to Ford, Leary replied, "I should jump over this table and knock the snot out of you." [DN 14-14 at 1.] Leary's account is somewhat different. She claims that she said, "Do I need to smack you this morning and get your coffee going?" to lighten the mood of the meeting. [DN 14-4 at 28; DN 14-14 at 1.] Leary was suspended two weeks without pay for this incident. [DN 14-14 at 2.]

During Ford's investigation of the June 24 "knock the snot out of you" incident, Leary emailed Hoffman, complaining of perceived harassment by Littles:

> I would like to mention and/or ask questions to a couple of related items:
>
> 1) If what I said to Milton on the 23rd or 24th was so annoying or bad, why did he wait 3 days to say anything about it?
> 2) Why am I being held to a different level of tolerance than other managers? For example, on June 6th, an Op Com member used the word "s***" and "f***" several times with me on a 3 to 4 minute phone conversation.
> 3) Today I witnessed 2 different groups of engineers using the "f" word openly.
> 4) I was recently written up for using the term "Bite me". Why was it ok for Milton to tell a story to two of my hourly employees

> (females) about a worker who told another worker to "bite me"
> and the employee did?
>
> 5) Today is the first day back from shutdown. Milton has been on
> a "roll" since I walked in. I have agreed with all of his requests.
>
> I would encourage HR to meet with my hourly folks. I would
> encourage HR to meet with my salary folks. The continued bullying
> and microscopic management behavior from Mr. Littles towards [me]
> needs to stop.

[*Id.* at 5.] Hoffman once again asked Leary for specifics regarding the employees she felt were receiving preferential treatment, but she refused. [*Id.* at 4.]

Leary returned from her disciplinary layoff on August 11. During the week that followed, several of Leary's fellow employees complained of her inappropriate behavior during meetings. Variously, they said Leary exhibited an "unprofessional communication style" that was "very aggressive . . . [and] consistent with the problem solving techniques used in plants 12 years ago and further back." [DN 14-15 at 2.] During this investigation into Leary's conduct, Leary emailed Lisa Flaherty on August 16, raising more concerns with Littles' behavior:

> I don't feel comfortable working for Mr. Littles. He is unreasonable
> and threatening. . . . I feel as though he is putting me in an
> unhealthy/hostile work environment. I feel as though the recent
> incidents with Mr. Littles are borderline harassment. I don't feel as
> though I can stay focused on my job due to the constant scrutiny that
> Mr. Littles has me under. I also indicated that I do not want to work
> for Mr. Littles because he pushes all my wrong buttons. I also
> referenced that it is no different than how he pushes Mr. Gifford, Mr.
> Brasher, and Mr. Garner into explosive type conversations. I actually
> indicated that I want no contact with Mr. Littles.

[*Id.* at 6.] Two days later, Human Resources Manager John Alkire responded to Leary's complaints:

Regarding your allegations of harassment by Mr. Littles and working in a hostile environment: To date, you have been investigated and disciplined for unprofessional behavior and absenteeism related issues. Each and every incident is reviewed by Ford Motor Company Personnel Relations. They are not independent actions taken by [Kentucky Truck Plant]. These are not harassment issues, nor hostile work environment issues. Salaried Personnel Supervisor Chuck Hoffman has asked you for specifics of your allegations each time you have made them. You have yet, to date, provided specifics.

[DN 14-16 at 8-9.]

All told, Leary was formally disciplined four times during 2014. *See* [DN 14-26 at 3.][1] For the "bite me/I don't give a f***" incident, Leary was given a two-year letter of reprimand. [*Id.*] For the "slap the snot out of you" incident, Ford meted out a two week suspension. [*Id.*] And for her two Attendance Guidelines violations, Leary was first given a two-year letter of reprimand and then a one week suspension. [*Id.*]

Sometime in 2015, Ford transferred Leary back to the paint department.[2] [DN 14-4 at 43.] Here, Leary was working under Paint Area Manager Bob Fishel. [DN 14-22 at 1.] On April 21, Leary participated in a weekly conference call. Leary became frustrated at the pace of the call, and particularly with a Dearborn employee named Tim Statz. Leary felt Statz was lingering too long on issues of minor importance, and on three occasions said "next," attempting to move the call along. [DN 14-4 at 45.] Following the call's conclusion, Leary went into a glassed-

---

[1] The parties have submitted two versions of a chart detailing the disciplinary actions taken against other salaried employees at the Kentucky Truck Plant during the relevant time period. One version redacts the employee ID number from the chart; the other does not. *See* [DN 17; DN 14-26.] Leary's 2014 infractions appear at [DN 14-26], lines 18, 19, 23, and 25.

[2] Leary does not argue that this transfer constituted an adverse employment action. *See generally* [DN 22.]

in conference room called the "fishbowl" with two contract employees. [*Id.*] Leary says she and the contractors "started laughing because the phone call was very painful, not productive." [*Id.* at 45.] Leary does not recall her exact comments, but admits that she probably used profanity, including "f***" or one of its derivations. [*Id.* at 46.]

Other employees paint a different picture. Process Engineering Specialist Teresa Douglas, seated about twenty feet away from the fishbowl, said Leary "was screaming and yelling and cussing." [DN 14-22 at 6.] Douglas was on her own conference call, and found it necessary to take it off speakerphone "so [Leary's] screaming would not come across through the phone." [*Id.*] While Douglas "could not make out whole sentences," Douglas could tell Leary "was upset and using profanity," including "[w]hat the f*** is going on here, f*** this f*** that, when is this s*** going to get done. She used hell also." [*Id.* at 6-7.]

Joel Collop was one of the contract engineers in the fishbowl with Leary. Collop said Leary's behavior was not threatening, but she did "loudly make it very clear how much she disagreed [with Statz] and went overboard on the language she used." [*Id.* at 15.] He could not recall Leary's specific statements, but believes Leary "threw out the f word a couple of times. Something like this is f*****g retarded. Something is f*****g stupid. Just some f words used in different ways." [*Id.*] The other contract employee, Terry Butner, said Leary "was loud but maybe not screaming." [*Id.* at 22.] Butner remembers Leary saying "GD" but not "the f word." [*Id.* at 23.]

Not all accounts of the fishbowl incident are as severe. Charlie Heltkemper, another Process Engineering Specialist, did not hear Leary's outburst. [*Id.* at 27.] His cubicle is about thirty feet away from the fishbowl. [*Id.*] However, filmbuild analyst Todd Williams estimates he was fifty feet away from the fishbowl and heard Leary speak in "a loud voice." [*Id.* at 10.] He did not hear Leary curse or use threatening language. [*Id.*]

In any event, the fishbowl incident seems to have been the final straw for Ford. The company terminated Leary's employment on May 19, 2015. Ford's disciplinary record details its reasoning:

> [Leary] was heard talking loudly and using profanity in a conference room with two contract employees. [Leary] has continued to make inappropriate and unprofessional comments in the workplace despite being disciplined twice previously for similar behavior.

[DN 14-26 at 2, line 9.] Leary filed a charge of discrimination with the EEOC, alleging that Ford retaliated against her for complaining of Littles' harassment of her and treated similarly-situated employees who used inappropriate language differently than her. [DN 14-23 at 2.] The EEOC was unable to conclude that Ford violated any of the applicable statutes, and closed its case. [DN 14-24 at 1.]

Littles then brought the instant suit. Originally, Leary claimed that Ford engaged in disability and age discrimination. *See* [DN 1 at 4-7.] However, following discovery, Leary abandoned those claims. [DN 22 at 2, n.1.] Now, all that remains before the Court are Leary's gender discrimination and retaliation claims. Ford moves for summary judgment on both. *See* [DN 14.]

## II. Standard of Review

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52). As the party moving for summary judgment, Ford must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of each of Leary's claims. Fed. R. Civ. P. 56(c); *see Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming Ford satisfies its burden of production, Leary "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

### III. Discussion

### A. Gender Discrimination

Leary's first claim against Ford is for gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In a Title VII action, the burden is on the plaintiff to establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). The plaintiff may prove his or her case through direct or circumstantial evidence of discrimination. *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1246 (6th Cir. 1995). The parties agree that no direct evidence of discrimination exists in this case. "In the absence of direct evidence . . . Title VII claims are subject to the familiar burden-shifting framework set forth in *McDonnell* . . . as subsequently modified in *Texas Department of Community Affiars v. Burdine,* 450 U.S. 248 (1981)." *Risch v. Royal Oak Police Dept.,* 581 F.3d 383, 390 (6th Cir. 2009). Under *McDonnell,* after the plaintiff has established a prima facie case of discrimination, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell*, 411 U.S. at 802. If the employer demonstrates such a reason, the burden shifts back to the plaintiff to show that the stated reason is in fact pretext for unlawful discrimination. *Id.* at 804. The burden of

persuasion remains with the plaintiff at all times. *Risch,* 581 F.3d at 391 (citing *Burdine,* 450 U.S. at 253).

To establish a prima facie case of gender discrimination, the plaintiff must demonstrate that (1) she is a member of a protected class, (2) that she was subjected to an adverse employment decision, (3) that she was qualified for the position, and (4) that a similarly situated, non-protected employee received more favorable treatment. *Talley*, 61 F.3d at 1246. Here, the parties do not dispute that Leary, a female, is a member of a protected class, that she was disciplined and eventually terminated, or that she was qualified for her position at Ford. The only element of Leary's *prima facie* case that is disputed is whether similarly-situated male employees were treated differently.

The Sixth Circuit "has explained that 'the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the relevant aspects' in order for the two to be similarly-situated.'" *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (emphasis removed). In the context of employee discipline, "the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct." *Id.* However, "the weight to be given to each factor can vary depending upon the particular case," *id.*, and courts "should make an independent determination as to the relevancy of a particular aspect of the

plaintiff's employment status and that of the non-protected employee," *Ercegovich*, 154 F.3d at 352.

On this point, Leary contends that "[t]ime after time, males who used inappropriate language were not subject to termination," providing specific examples from the aforementioned chart. [DN 22 at 9; *see* DN 14-26.] But even if these employees are adequate comparators, Leary has not shown that she was treated any differently. From 2010 to 2015, Leary was the only salaried female employee disciplined for inappropriate or abusive language at the Kentucky Truck Plant, and she was disciplined three times. *See* [DN 14-26.] After the "bite me/I don't give a f***" incident, Leary was given a two-year letter of reprimand. [*Id.* at 3.] She was suspended for one week following the "slap the snot out of you" incident, and her termination occurred after the fishbowl incident. [*Id.*]

As Leary correctly points out, it is true that other salaried employees were not terminated for using profanity. But Leary paints with a broad brush. Many of the employees to which Leary refers were disciplined only once for inappropriate language. As such, those employees are inappropriate comparators. In fact, there is no evidence that any salaried employee at the Kentucky Truck Plant was similarly-situated to Leary, who was formally disciplined six separate times between 2010 and 2015. None of her colleagues were disciplined more than three times during that same period for similar conduct.

If any comparator could be found, it would be an employee who was disciplined multiple times for inappropriate language. Besides Leary, three

salaried employees fit this bill.   In 2011, employee CE0[3] was suspended for two weeks after calling his superiors "stupid motherf*****s," told them they "[didn't] have a f*****g clue," and did not attend a follow-up meeting to discuss the issue. Approximately a year-and-a-half later, employee CE0 "was insubordinate and disrespectful to his supervisor," using profanity in the process.   Ford suspended him without pay for four weeks.   Employee CE0 received a second four-week suspension in 2014 for sending a "disrespectful, unprofessional email" and using profanity during a meeting.

Employee GH7[4] was also disciplined three times for abusive language.   In 2014, he "was verbally abusive and used profanity on multiple occasions when talking to both hourly and salaried employees," resulting in a one-week suspension. That same year, employee GH7 was again verbally abusive towards his colleagues. Ford suspended him for two weeks.   Ford terminated employee GH7's employment in 2015 after he "continued to display a pattern of threatening conduct, inappropriate and unprofessional behavior towards employees."

Employee GV1[5] was disciplined twice.   In 2010, he "initiated and instigated a confrontation with another salaried employee[,] . . . yelled profanities, and called the other employee profane names."   He was suspended for one week.   And in 2015, employee GV1 "gave unwanted attention to a female hourly employee, showed

---

[3] The unredacted chart identifies employees by an alphanumeric ID.   *See* [DN 17.]   The Court will refer to the employees by the first three characters of their respective IDs.   Employee CE0's infractions appear at [DN 14-26], lines 22, 41, and 43.

[4] Employee GH7's infractions appear at [DN 14-26], lines 7, 17, and 26.

[5] Employee GV1's infractions appear at [DN 14-26], lines 25 and an unnumbered line between lines 8 and 9.

pornographic images . . ., [and] made inappropriate comments of a racial nature."
This episode earned employee GV1 a two-week suspension.

Even if employees CE0, GH7, and GV1 are appropriate comparators, no evidence indicates that Leary was treated differently than her male counterparts. In fact, for her first two infractions, Leary's punishment was more lenient. It is true that Leary was terminated for her third instance of bad language when employee CE0 was not. However, between the "slap the snot out of you" incident and the fishbowl incident, Leary was also disciplined twice for violating her attendance guidelines. Employee CE0 did not have engage in similar conduct warranting discipline. Leary cannot show that she was treated any differently than her male counterparts, and thus cannot maintain a *prima facie* case of gender discrimination.

Even assuming *arguendo* that she could, Ford would still be entitled to summary judgment. Once Leary makes out her *prima facie* case, the burden shifts to Ford to "articulate some legitimate, nondiscriminatory reason" for her termination, although it need not "prove [the] absence of [a] discriminatory motive." *Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978) (citation omitted and emphasis removed); *McDonnell*, 411 U.S. at 802. Here, Ford has done just that. Ford explains that "there was no one at the plant of any sex or age who had as many disciplines as Leary in terms of abusive language and other issues." [DN 14-1 at 13.] Leary persistently arrived late to work and failed to call in before her shift was scheduled to begin, even after Ford put formal attendance guidelines

15

in place. While Leary may have had reasons for her tardiness, she does not deny that she was tardy on the occasions alleged by Ford. Similarly, although Leary might have believed her statements during the "bite me/I don't give a f***," "slap the snot out of you," and fishbowl incidents were made in a joking manner, she does not deny the substance of the statements themselves. The Court is satisfied that Ford's proffered reasons for terminating Leary are legitimate and nondiscriminatory. *See Kemske v. Johnson Controls, Inc.*, 52 F. Supp. 3d 688 (D. Del. 2014) (termination upheld when female employee engaged in harassing conduct and used abusive language); *Carragher v. Ind. Toll Road Concession Co.*, 936 F. Supp. 2d 981 (N.D. Ind. 2013) (termination upheld when female employee used profanities to refer to supervisors).

The burden now shifts back to Leary to show that Ford's stated reasons for terminating her are pretext for unlawful gender discrimination. *McDonnell*, 411 U.S. at 804. To demonstrate pretext, the plaintiff "must show the employer's given reason for its conduct had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012) (citation and internal quotation marks omitted). Here, Leary points to no evidence of record demonstrating that Ford's decision to terminate her was pretextual, and her argument on this issue is only conclusory in nature. *See* [DN 22 at 15.] Ford has shown, and Leary has not rebutted, that no genuine issue of material fact

remains on her Title VII gender discrimination claim. Ford is thus entitled to judgment as a matter of law.

## B. Retaliation

Leary's second remaining claim is for retaliation, also in violation of Title VII. "The statute makes it unlawful for an employer to discriminate against an employee because the employee opposed an unlawful employment practice, or made a charge, or participated in an investigation, proceeding, or hearing related to Title VII." *E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 543 (6th Cir. 1993). A plaintiff may prove her Title VII retaliation claim through direct or circumstantial evidence. *Henry v. Ohio Dept. of Mental Retardation & Developmental Disabilities,* 162 F. Supp. 2d 794, 800 (S.D. Ohio 2000). Again, this case presents no direct evidence of retaliation, so the Court must apply the *McDonnell* balancing test explained above in greater detail. *Id.; McDonnell,* 411 U.S. at 802. "[T]o establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir. 2003); *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000). The causal connection must be proven by sufficient evidence to demonstrate an inference that, had the plaintiff not engaged in his protected rights, the defendant would not have taken the adverse action. *Id.* If the plaintiff successfully

establishes a *prima facie* case of retaliation, "a presumption of unlawful retaliation arises and the burden of production shifts to the defendant to rebut the presumption by articulat[ing] some legitimate, nondiscriminatory reason for its action." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013) (citation and internal quotation marks omitted). Then, if the defendant successfully produces a legitimate, nondiscriminatory reason, "the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." *Fuhr*, 710 F.3d at 675 (citing *Abbott*, 348 F.3d at 542).

The parties dispute two elements of Leary's *prima facie* retaliation claim. Ford argues that Leary's complaints to human resources regarding Littles' behavior do not constitute protected activity under Title VII. [DN 29 at 6-7.] Further, Ford contends that Leary cannot establish a causal connection between her complaints and her termination. [DN 14-1 at 18.]

First, because Leary's alleged complaints of discrimination were not made in connection with or in anticipation of any EEOC charge, Leary must have opposed a practice made unlawful by Title VII to have engaged in protected activity. 42 U.S.C. § 2000e-3(a); *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 906-07 (W.D. Ky. 2015). "'Opposing' conduct . . . includ[es] complaining to anyone . . . about allegedly unlawful practices." *Johnson v. U. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Additionally, "the manner of opposition must be reasonable, and . . . the opposition [must] be based on 'a reasonable and good faith belief that the

opposed practices were unlawful.'"  *Id.* (quoting *EEOC Compliance Manual*, (CCH) ¶ 8006).

Here, in response to Ford's interrogatories, Leary stated she "was retaliated against after she filed a complaint with Chuck Hoffman on or about July 7, 2014 about Milton Littles' discriminatory treatment of her in comparison to her male colleagues concerning language in the workplace." [DN 14-3 at 12.]  That complaint came in the form of an email.  *See* [DN 14-14 at 4-5.]  However, in her message, Leary never alleges that Littles is treating her differently because of her gender.  The closest Leary comes is her statement that she is "being held to a different level of tolerance than other managers" with respect to her use of profanity.  [*Id.* at 5.]  But when pressed for specifics, Leary refused to identify those other managers or even say whether they were male or female.  *See* [*id.* at 4.] As other courts have recognized, "a general complaint of unfair treatment is insufficient to establish protected activity under Title VII," and "complaints must be specific enough to notify management of the particular type of discrimination at issue in order to constitute protected activity."  *Mikell v. Marriott Intern., Inc.*, 789 F. Supp. 2d 607, 618-19 (E.D. Pa. 2011) (cleaned up).  The generic complaints contained in Leary's July 7 email are insufficient to constitute protected activity under Title VII.[6]

---

[6] In her response to Ford's motion to dismiss, Leary also references in passing an email she sent to Hoffman on December 18, 2014.  [DN 22 at 16.]  Like her July 7 email, Leary makes no explicit or implicit charge of gender discrimination, merely stating, "I am Mr. Littles' 'target' and I am sick of it."  [DN 22-12 at 1.]  Leary's December 18 email also does not constitute protected activity.

Leary's second email, this time to Lisa Flaherty, comes closer to the mark. On August 16, 2014, Leary told Flaherty, "I don't feel comfortable working for Mr. Littles. He is unreasonable and threatening. . . . I feel as though he is putting me in an unhealthy/hostile work environment. I feel as though the recent incidents with Mr. Littles are borderline harassment." [DN 14-15 at 6.] As Ford correctly points out, Leary goes on to say that Littles was treating several male employees the same way. [*Id.*] However, drawing all reasonable inferences in Leary's favor, the Court does believe Leary's August 16 email constitutes opposition to a perceived violation of Title VII's prohibitions against gender-based discrimination and harassment, and was therefore protected activity.

Nevertheless, Leary's *prima facia* retaliation claim falters at the element of causation. "To establish [a] causal connection . . . a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citations omitted). The plaintiff's burden at the *prima facie* stage is "minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Id.* at 566 (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). A plaintiff may establish a causal connection using "[e]vidence of temporal proximity between the

protected activity and the adverse employment action, coupled with other indicia of retaliatory conduct." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

Here, Leary engaged in protected activity on August 16, 2014 when she sent an email to Lisa Flaherty, voicing her concerns with Littles' treatment of her and her coworkers. The next disciplinary action Ford took against Leary occurred on September 15, 2014, when Leary was given a two-year letter of reprimand for violating her formal attendance guidelines. [DN 14-26 at 3.] Her termination for the fishbowl incident followed eight months later. [*Id.* at 2.] In the context of Title VII, temporal proximity is insufficient to establish causation unless the "adverse employment action occurs very close in time after [the] employer learns of a protected activity." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Standing alone, the timeline in this case does not suggest a retaliatory motive on Ford's part. *See Williams v. Zurz*, 503 F. App'x 367, 373 (6th Cir. 2012) (no inference of retaliation when plaintiff presented "no evidence [of causation] beyond the one-month temporal proximity" between protected conduct and termination); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (no inference of retaliation when plaintiff discharged four months after filing discrimination charges). This is especially true given that the tardy giving rise to Leary's September 15 letter of reprimand occurred on August 16 – the day *before* Leary engaged in protected activity. And aside from the simple fact that Leary's termination occurred later in time than her protected activity, Leary points to no "other indicia of retaliatory conduct." *Dixon*, 481 F.3d at 333. Leary cannot

establish that Ford would not have taken adverse action against her but for complaining of Littles' alleged harassment, so Ford is entitled to summary judgment on Leary's Title VII retaliation claim as well.

Again, assuming *arguendo* that Leary could make out a *prima facie* retaliation claim, Ford has articulated a "legitimate, nondiscriminatory reason for its action." *Fuhr*, 710 F.3d at 674 (6th Cir. 2013). For the reasons more fully explained in Part III.A of this Memorandum Opinion, Ford has shown that its true motivation for terminating Leary's employment was her continuing pattern of inappropriate language and tardiness. Leary was reprimanded on multiple occasions and subjected to progressive discipline, but persisted in her course of conduct. Leary has not shown that Ford's proffered explanations are "a mere pretext for discrimination." *Id.* (citing *Abbott*, 348 F.3d at 542). Her retaliation claim fails at this step as well.

## IV. Conclusion

Ford has shown, and Leary has not rebutted, that no genuine issue of fact remains on either of Leary's Title VII claims.   Leary has not demonstrated that similarly-situated male employees were treated differently, or that Ford retaliated against her for complaining of perceived harassment by her supervisor.   Ford has, however, satisfied its burden under *McDonnell Douglas* to show that it terminated Leary for a legitimate, nondiscriminatory, and non-pretextual reason – her poor workplace discipline.   Accordingly, Ford is entitled to summary judgment, and Leary's case must be dismissed.

A separate order and judgment shall issue.

CC: Counsel of Record